**Dawn QUICK, Plaintiff,**

v.

**TRIPP, SCOTT, CONKLIN & SMITH, P.A., Defendant.**

No. 97–6784–CIV.

United States District Court, S.D. Florida.

March 16, 1999.

G. Ware Cornell, Jr., Ft. Lauderdale, FL, for plaintiff.

Peter G. Herman, Ft. Lauderdale, FL, Arch Stokes, College Park, GA, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GOLD, District Judge.

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment [D.E. # 13]. Plaintiff, Dawn Quick, filed this action against Defendant, Tripp, Scott, Conklin & Smith, P.A., alleging that she was subjected to discrimination and termination on account of a recognized disability. Plaintiff claims violations of Title I of the Americans With Disabilities Act, codified at 42 U.S.C. § 12101, *et seq.* (the "ADA"), and of the Florida Civil Rights Act of 1992, Fla.Stat. § 760.01, *et seq.* (the "Florida Act").

Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims arising under federal law. The Court has pendent jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

Defendant has moved for summary judgment on the bases that: (1) Plaintiff is not an "otherwise qualified individual with a disability" as required for entitlement to relief under the ADA; (2) even if Plaintiff is considered to be a qualified individual with a disability, the accommodation demanded by Plaintiff was not reasonable; and (3) assuming Plaintiff can establish a prima facie case of discrimination under the ADA, Defendant has presented a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff, which has not been rebutted by a preponderance of evidence. Plaintiff challenges Defendant's representation that no genuine issue of material fact exists concerning whether Defendant intentionally discriminated against Plaintiff based on her asserted disability. Specifically, Plaintiff claims that: (1) Defendant knew that Plaintiff was dis-

abled; (2) Defendant perceived Plaintiff as being disabled; (3) Plaintiff had a physical impairment which substantially limited a major life activity; (4) Defendant treated Plaintiff differently than other similarly situated employees who were not disabled; and (5) Defendant's articulated reasons for terminating Plaintiff were actually pretext for discrimination.

The Court finds that Plaintiff has not satisfied the elements necessary to establish a prima facie case under the ADA. Moreover, even if a prima facie case had been established, Plaintiff has not presented evidence that a genuine issue of fact exists regarding pretext to rebut Defendant's articulated legitimate, nondiscriminatory reasons for its decision to terminate Plaintiff's employment.

## I. Factual and Procedural Background

Plaintiff's claims derive from her employment as a junior paralegal at Defendant's law firm. The facts in the record, viewed in the light most favorable to Plaintiff ("Quick"), reflect that Quick was hired by Defendant ("Tripp Scott") on October 30, 1991. Initially, Quick was responsible for providing copying services and ensuring that office supplies were sufficiently stocked. Within a year of her hire, Quick was promoted to the position of file clerk. Subsequently, she was promoted to the position of junior paralegal in Tripp Scott's insurance defense department in late 1993 or early 1994. Throughout her employment history with Tripp Scott, Quick received above average periodic evaluations and salary increases commensurate with her improved abilities. At all times, Quick's ultimate supervisor was Anne Lopez, Tripp Scott's office manager.

Quick's responsibilities as a junior paralegal included typing, calendaring, file organization, subpoena tracking, and preparing notebooks and exhibits for trial. It is apparent that she was well liked and appreciated by her supervising paralegals. Although Quick admits that she occasionally missed work to care for her child, her punctuality and attendance were rated average or above. There are no records of disciplinary actions instituted against her.

In September 1995, Quick took a fourteen-week maternity leave of absence. Prior to taking her leave, Quick trained Cathy Sampsidis to fill in for her in the insurance defense department. Sampsidis, who had been hired on July 7, 1995, had been working as a junior paralegal in Tripp Scott's medical malpractice department. When Quick returned from maternity leave on January 2, 1996, she resumed her position as junior paralegal in the insurance defense department.

Shortly thereafter, Quick began experiencing sinus problems and chronic headaches. She was diagnosed with a sinus infection and prescribed antibiotics. However, because Quick's symptoms persisted, she returned to her physician, who prescribed a stronger antibiotic and drew a blood sample for testing. On February 12, 1996, Quick was informed that her blood test revealed elevated liver enzyme levels, believed to be symptomatic of the antibiotic treatment. However, her headaches continued, accompanied by a low fever, nausea, and fatigue.

For several weeks, Quick continued to experience these chronic symptoms, Consequently, she returned to her physician, at which time additional blood was drawn on March 12, 1996. These test results revealed that Quick's liver enzyme levels remained high.

Because Quick missed work due to her medical appointments, she reported her absences to Cindy Miller, her supervising paralegal, and to Ellen Prescher, Lopez's assistant. Quick explained that she was seeking treatment for her chronic headaches.

While at Tripp Scott's offices on April 1, 1996, Quick telephoned her physician. Her doctor communicated that, although further testing was necessary, his initial findings indicated the probability that Quick had contracted the Hepatitis C virus. She was told that Hepatitis C is a

non-curable disease that attacks and debilitates the liver. The virus is contagious, and is transmitted through sexual contact and interchanges of blood.

Devastated by the news, Quick broke down. Miller, overhearing Quick's crying, offered comfort. Quick related the doctor's preliminary findings. Upon learning of her condition, Miller assisted Quick in learning more about the disease.

When the preliminary diagnosis was confirmed later that month, Miller suggested that Quick speak with Paula Herman, a nurse. Ms. Herman was hired to provide consultations in Tripp Scott's medically-related cases. She is also the sister of Peter Herman, who, at that time, was the partner in charge of the insurance defense department.[1] Ms. Herman provided additional information about Hepatitis C and concurred that the disease is incurable.

Quick contends that Miller breached her confidence by divulging Quick's diagnosis to other employees at the firm. Although Quick asked Miller not to tell others, Miller allegedly told Lopez, Prescher, and Ms. Herman without Quick's permission. Nevertheless, when these employees offered condolences and support, Quick voluntarily explained her disease. Prescher also suggested that Quick remain silent about her condition to avoid phobic reaction by members of the firm. Quick continued to perform the essential functions of her job as a junior paralegal.

At a meeting held two months later on June 13, 1996, Tripp Scott informed its personnel that the insurance defense and medical malpractice departments were being eliminated. Tripp Scott had been considering the restructure and refocus of firm resources since January 1996. Employees of the affected departments were told they would be notified individually regarding their future status with the firm. Decisions concerning personnel lay-offs were to be dependent upon several factors relative to the affected employees: seniority, skills, qualifications, educational background, and specialization. These factors were to be further evaluated in the context of the number of positions available to absorb relocated employees.

Lopez was responsible for compiling the necessary data from the files of the litigation support staff. After the evaluation process was completed, employees were individually informed of their terminations. Quick was the last employee to be summoned to Lopez's office, at which time she was notified of termination, effective July 1, 1996.

Seeking to avoid the loss of her job, Quick approached Lopez and offered to take a demotion. However, no vacancies were available. Lopez urged Quick to enroll in a certified paralegal course, which might bolster the chances of retaining her job. In the meanwhile, Lopez promised to speak with the president of Tripp Scott about finding a possible position for Quick.

Quick followed Lopez's advice. She went to a community college and obtained materials and information about paralegal course work. Classes were scheduled for the Fall. Quick relayed this information to Lopez and told her that, if Tripp Scott would retain her, she would enroll. Unfortunately, Quick was told that no positions were available for her at that time. Accordingly, Quick redirected her efforts toward finding a job outside of the firm.

A paralegal at Tripp Scott, Susan Stefan, arranged for Quick to interview with another law firm. Quick then revealed to Stefan that she had been diagnosed with Hepatitis C. Stefan, according to Quick, told Quick to disclose this information to

---

1. Quick has presented conflicting positions regarding the voluntariness of her discussions with Ms. Herman. In her Affidavit filed in support of her opposition to Tripp Scott's motion for summary judgment, Quick contends that she was coerced into speaking with Ms. Herman. However, in deposition, she testified that, although she did not want others to know of her condition, she liked Ms. Herman and "didn't mind talking to her." Quick's Deposition, at 50.

the interviewing firm. Quick claims that upon hearing of her condition, the firm declined to hire her due to insurance concerns.

Nevertheless, Quick obtained a position with the guardianship program located at the Broward County Courthouse. Initially, because she was able to perform her job responsibilities and she feared termination, Quick did not inform her new employer that she had the Hepatitis C virus. However, within six months, she began requesting time off from work due to her illness. Ultimately, Quick explained the reason for her frequent absences. Although her employer accommodated her medical needs and provided insurance benefits, Quick voluntarily terminated her employment in August 1997. Quick states that she became too sick to continue working.

Quick last worked at Tripp Scott's offices on June 27, 1996. On September 18, 1996, she filed a Charge of Discrimination concurrently with the Equal Employment Opportunity Commission (the "EEOC") and the Florida Commission on Human Relations. Upon receiving a Notice of Right to Sue from the EEOC, Quick timely filed her civil complaint in this Court. The Complaint contains two counts: Count I alleges that Tripp Scott's decision to terminate Quick was motivated by her disability or perceived disability in violation of the ADA; Count II alleges the same wrongful conduct violated the Florida Act. Quick is seeking compensatory and punitive damages, as well as equitable, declaratory and injunctive relief. After thoroughly reviewing the record, carefully considering the arguments of the parties, and applying the relevant law, the Court finds that Defendant's Motion for Summary Judgment should be granted.

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment where the pleadings and supporting materials demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judg-

ment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is one that might *affect* the outcome of the suit under the governing law. *See id.* "[T]he substantive law will identify which facts are material, [and a] dispute about a material fact is genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A plaintiff cannot defeat a defendant's properly supported motion for summary judgment without an affirmative presentation of specific facts showing a genuine issue, and may not merely rely on the general allegations of the pleadings. *See id.* A mere scintilla of evidence is insufficient to defeat a motion for summary judgment:

> [I]n every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

*Id.* at 251, 106 S.Ct. at 2511 (quoting source omitted). In reviewing a motion for summary judgment the court focuses on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson, supra*).

To determine whether there exists a genuine issue precluding summary judgment, federal courts employ the two-prong framework of shifting burdens established by the U.S. Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This framework places the initial burden on the moving party to establish the absence of a genuine issue as to any material fact. *See Allen*, 121 F.3d at 646 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

The moving party may discharge this burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. In deciding whether the burden has been satisfied, the Court must view the evidence and all reasonable inferences arising from it in the light most favorable to the nonmoving party. *See Allen,* 121 F.3d at 646 (citation omitted).

Once the movant has satisfied its burden, the burden shifts to the nonmoving party to present evidence sufficient to make a "showing that the jury could reasonably find for that party." *Allen,* 121 F.3d at 646 (citations omitted). Facts asserted by a summary judgment opponent must be regarded as true if supported by affidavit or other evidentiary material. *See Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir.1981). However, where the nonmoving party fails to prove an element essential to that party's case and on which that party will bear the burden of proof at trial, summary judgment is warranted. *See Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.; see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–17 (11th Cir.1993). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen,* 121 F.3d at 646.

On a motion for summary judgment, courts lack authority to determine the truth of a matter in dispute. Thus, the Court's task is merely to identify those disputed matters and to determine the degree of their importance to the pending action. *See id.*

## III. Discussion and Analysis

Quick alleges that Tripp Scott was aware that she had contracted the Hepatitis C virus prior to terminating her. Quick further alleges that, although she needed and requested no accommodation to perform the essential functions of her job as a junior paralegal, Tripp Scott should have reassigned her to another position rather than terminate her. Moreover, because Tripp Scott perceived Quick as disabled, she was treated less favorably than similarly situated employees without disabilities. According to Quick, Tripp Scott had an obligation to accommodate her by terminating a nondisabled employee while retaining her. Quick seeks relief provided under the ADA.

### A. The Purpose Behind the ADA

■ The ADA was enacted to eradicate discrimination against persons with disabilities and to ensure equality of treatment. 29 C.F.R. § 1630.1(a) (1998). In the employment context, the ADA was created to give qualified employees protection from discrimination based on their known or perceived disability.[2] The statute was not designed to give disabled persons the power to invoke affirmative action:

> Like the Civil Rights Act of 1964 that prohibits discrimination on the basis of color, religion, national origin, and sex, the ADA seeks to ensure access to equal employment opportunities based on merit. It does not guarantee equal results, establish quotas, or require preferences favoring individuals with disabilities over those without disabilities.

29 C.F.R. § 1630 app. at 345. Rather, the sole and express intent of the ADA is to provide equal, not preferential, opportunities to disabled persons. *See Terrell v. USAir,* 132 F.3d 621, 627 (11th Cir.1998).

■ To be eligible for relief under the ADA, a plaintiff must satisfy the same

2. Title I of the ADA provides that: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advance-ment, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). .

evidentiary burdens demanded by similar statutes addressing claims of employment discrimination. A crucial ingredient in all actions alleging discriminatory treatment by an employer based on conduct proscribed by the ADA, is proof of discriminatory motive. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 325 n. 5, 97 S.Ct. 1843, 1854 n. 5, 52 L.Ed.2d 396 (1977). In establishing unlawful motive, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In this case, the issue is whether Tripp Scott *intentionally* discriminated against Quick on the basis of her disability.

To establish a case of intentional discrimination, a plaintiff may rely on direct or circumstantial evidence. Therefore, a threshold determination whether the evidence produced by Quick is direct or circumstantial evidence of discrimination must be made. The type of evidence before the Court, direct or circumstantial, dramatically affects the allocation of evidentiary burdens. If Quick produces competent evidence of discriminatory intent, Tripp Scott must prove by a preponderance of the evidence that the same employment decision would have been reached even absent the discriminatory motive. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989); *Smith v. Horner,* 839 F.2d 1530, 1536 (11th Cir.1988). If the evidence relied upon by Quick is circumstantial, Tripp Scott's burden on rebuttal is to produce a legitimate, nondiscriminatory reason for the challenged employment decision. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). This burden is merely one of production, not persuasion, and is exceedingly light. *See Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).

Direct evidence is that which, if believed, proves the existence of a fact in issue without inference or presumption. *See Burrell v. Board of Trustees of the Ga. Military College,* 125 F.3d 1390, 1393–94 (11th Cir.1997); *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 643 (11th Cir.1998) (citing *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir. 1997)). Generally, direct evidence relates to the actions, statements, or biases of the person making the challenged employment decision. *See Trotter v. Board of Trustees of the Univ. of Ala.,* 91 F.3d 1449, 1453–54 (11th Cir.1996). If, however, the evidence presented is, by inference, subject to more than one possible meaning, it is not direct evidence and must be considered circumstantial evidence. *See Carter,* 132 F.3d at 643 (citing *Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1082–83 n. 2 (11th Cir.1996)).

For cases alleging discriminatory intent based upon circumstantial evidence, courts adhere to the Supreme Court's burden-shifting analysis set forth in *McDonnell Douglas, supra.* Pursuant to this framework, once a plaintiff establishes a prima facie case of discrimination, it is incumbent upon the defendant to rebut the plaintiff's claims by articulating a legitimate, nondiscriminatory reason for the adverse employment action of which the plaintiff complains—a reason worthy of credence. *See Carter,* 132 F.3d at 643. The defendant has the burden of production, and thus, does not have to persuade a court that it was actually motivated by the reason advanced. *See id.* Once Tripp Scott satisfies this burden of production, in order to prevail upon her claims, Quick must establish *both* that the proffered reason for the employment decision was false *and* that the real reason for the action was discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515–17, 113 S.Ct. 2742, 2751–52, 125 L.Ed.2d 407 (1993); *Isenbergh v. Knight–Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 441 (11th Cir. 1996). By so persuading the Court, Quick satisfies the required burden of demonstrating by a preponderance of the evi-

dence that she has been the victim of intentional discrimination. *See Carter,* 132 F.3d at 643.

Applying these principles, the Court's examination of the evidence in the record reveals no direct evidence of disability-based disparate treatment. Quick has not identified specific comments or incidents which she considers to be examples of discrimination. Absent direct evidence of discrimination, Quick's claims must be examined under the *McDonnell Douglas* burden-shifting framework. Accordingly, to qualify for relief under the ADA, Quick must first establish a prima facie case of disability discrimination by her employer.

### 1. *Plaintiff's Claim of Disability Discrimination Under the ADA*

■ A prima facie case of employment discrimination based on a disability under the ADA is established by demonstrating that Quick: (1) has a disability; (2) is qualified, with or without reasonable accommodations, to perform the essential functions of her job; (3) identified for Tripp Scott a reasonable accommodation; and (4) was unlawfully discriminated against because of her disability. *See Willis v. Conopco, Inc.,* 108 F.3d 282, 283 (11th Cir.1997). Quick must satisfy all elements of a prima facie case under the ADA in order to discharge her burden. The Court finds that she has failed to do so.

### a. *Establishing a Disability Under the ADA*

■ To satisfy the first element of a prima facie case of discrimination, Quick must demonstrate that she is disabled. The ADA defines "disability" to include: "(A) a physical or mental impairment that substantially limits one or more of the

major life activities of such individual; (B) a record of such impairment;[3] or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see also Harris v. H & W Contracting Co.,* 102 F.3d 516, 518–20 (11th Cir.1996). Merely having a physical impairment is insufficient to be covered by the ADA. *See Gordon v. E.L. Hamm & Assoc., Inc.,* 100 F.3d 907, 911 (11th Cir.1996); *cert. denied,* ⸺ U.S. ⸺, 118 S.Ct. 630, 139 L.Ed.2d 610 (1997). Rather, to constitute a disability, "the impairment [must] substantially limit one or more of the individual's major life activities." *Id.*

According to the Supreme Court, consideration of subsection (A) of the definition involves three steps. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998). The Court must first determine whether Quick has an impairment. *See id.* Next, the Court must identify the life activity upon which Quick relies, and determine whether it constitutes a major life activity under the ADA. *See id.* Finally, by "tying the two statutory phrases together," the Court must determine "whether the impairment substantially limit[s] [Quick's asserted] major life activity." *Id.* Determining whether a claimed impairment constitutes a disability and whether an identified endeavor constitutes a major life activity under the ADA are questions of law for the Court. *See id.*

The text of the ADA does not define "impairment." However, courts may seek guidance from the EEOC regulations issued to implement Title I of the ADA.[4] Pursuant to these regulations, a physical or mental impairment is:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological,

---

**3.** Quick has not produced any evidence that her disease was documented in her personnel file, and thus, has not shown a "record" of an impairment. *See Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 192 (5th Cir.1996). Nevertheless, since the Court has found that Quick has a disability, the lack of a record of a disability is of no consequence. Whether

Quick was "regarded as" having a disability, the third alternative of demonstrating the existence of a disability, will be addressed in the context of "pretext."

**4.** Congress directed the EEOC to promulgate regulations to implement the provisions of Title I of the ADA. *See* 42 U.S.C. § 12116.

**1366**

musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, *reproductive,* digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or physical disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (1998) (emphasis added). Not all covered impairments are enumerated within the regulation. It is meant to be "a representative list of disorders and conditions constituting physical impairments, including such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, and . . . drug addiction and alcoholism." *Bragdon,* 118 S.Ct. at 2202 (citation omitted).

Nor does the ADA define what constitutes "major life activities" and "substantial limitations." However, according to the EEOC's implementing regulations, "major life activities" are those "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *see also Bragdon,* 118 S.Ct. at 2205. An impairment is "substantially limiting" when the individual is:

(i) unable to perform a major life activity that the average person in the general population can perform; or

(ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

■ If the asserted impaired function is not contained within the EEOC's enumer-

ated exemplars of major life activities, courts must analyze the significance of the particular activity within the meaning of the ADA. *See Bragdon,* 118 S.Ct. at 2205 ("the touchstone for determining an activity's inclusion under the statutory rubric is its significance."). In determining whether a disability qualifies as a substantial limitation of a major life activity, courts are to consider: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment." *Gordon,* 100 F.3d at 911. Additionally, the Court may consider:

(4) the geographic area to which the individual has reasonable access;

(5) the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is disqualified because of the impairment; and

(6) the job from which the individual has been disqualified because of an impairment, and the number and types of jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical region from which the individual is also disqualified because of the impairment.

*Id.* at 912.

■ Quick has identified her disability as having contracted the Hepatitis C virus. She urges that, because Hepatitis C is a chronic illness that affects a major organ—the liver—it is a disability *per se.* However, not every illness qualifies as an ADA disability, even if the disease is life-threatening.[5] *See, e.g., Ellison*

---

5. Quick relies on *Bragdon* to support her position that Hepatitis C is a disability *per se.* However, the Supreme Court only held that,

because HIV substantially impairs the major life activity of reproduction, it can be consid-

*v. Software Spectrum, Inc.,* 85 F.3d 187, 190 (5th Cir.1996) (breast cancer, that required chemotherapy and treatment which caused the plaintiff to experience significant side effects, did not qualify as a disability); *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 60 (4th Cir.1995) (HIV and other sicknesses are not *per se* disabilities; courts must rely on specific evidence showing how the disease affected the plaintiff's daily activities). Determining whether an impairment meets the ADA's standard of "disability" must be evaluated in the context of how the claimed impairment affects the employee. *See, e.g., Runnebaum v. Nations-Bank of Md., N.A.,* 123 F.3d 156, 166 (4th Cir.1997) ("the statute's individualized focus contemplates a case-by-case determination of whether a given impairment substantially limits one or more of the major life activities of the individual"); *Taylor v. Principal Fin. Group. Inc.,* 93 F.3d 155, 164 (5th Cir.1996) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."). Thus, the Court must assess the significance of the particular activity allegedly impaired in light of the activity's importance to Quick.

▆▆ Quick has been less than clear in expressing which major life activities were substantially affected by the Hepatitis C virus. She has repeatedly contended that, after contracting the virus, she was able to fully perform all of the functions required as a junior paralegal. Therefore, it cannot be assumed that Quick's ability to work, considered a major life function, was substantially limited. Although not pled, the Court nevertheless extracts from Quick's response to Tripp Scott's motion for summary judgment the allegation that her ability to bear children has been substantially limited. Reproduction, Quick argues, is a major life activity of great significance to her. Quick argues that, since

Hepatitis C can be transmitted to the fetus of an infected mother, she must forego having more children.

Upon initial consideration, Quick's argument seems insupportable. Indeed, most cases which have addressed this issue confine their analysis of whether an employee's major life activity is substantially limited to the impact of the impairment on the employee's ability to perform a class of jobs. *See* 29 C.F.R. § 1630.2(j)(3)(i); *Gordon,* 100 F.3d at 910–13; *see also* 29 C.F.R. § 1630, App. § 1630.2(i) (a major life activity means "the basic activities the average person in the job population can perform with little or no difficulty, [such as] caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working"). The impact of Quick's ability to reproduce on her ability to perform ministerial office assignments appears tenuous. However, a recent U.S. Supreme Court case dispels the traditional notion that there be a nexus between the allegedly impaired employee's workplace abilities and the allegedly impaired major life activity. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

In *Bragdon,* an ADA case filed by an individual with AIDS, a plurality of the Supreme Court held that the inability to have children is a cognizable ADA disability. *See id.* at 2205. Finding that "[r]eproduction and the sexual dynamics surrounding it are central to the life process itself," the Court held that the ability to reproduce and to bear children constitutes a major life activity. *See id.* By evaluating the medical evidence that indicated an HIV infected woman imposes significant risks of infecting both her male partner during conception and her child during gestation and birth, the Court concluded that AIDS (the impairment) substantially limited the plaintiff's asserted major life activity (reproduction). *See id.*

ered a disability. The Supreme Court never actually reached the question whether HIV

infection is a *per se* disability under the ADA. *See Bragdon,* 118 S.Ct. at 2207.

This binding Supreme Court precedent compels the conclusion that Quick's assertion that the significant limitations placed on her major life activity of reproduction due to the Hepatitis C virus, qualifies as a recognized ADA disability.[6] Accordingly, Quick has satisfied the first element of a prima facie case under the ADA.

b. *Determining Whether Plaintiff Is "Qualified" Under the ADA*

The second prong of a prima facie case of discrimination under the ADA requires Quick to establish that she was qualified to perform the essential functions of her job, either with or without a reasonable accommodation. The undisputed evidence in the record reflects that Quick could perform all of the functions of a junior paralegal required by Tripp Scott. Moreover, Quick neither needed nor requested any accommodation to fulfill her job requirements. Thus, the Court need not belabor the finding that Quick is considered "qualified" within the context of the ADA.

c. *Discerning the Reasonableness of an Accommodation*

■ Under the ADA, an employer may be liable for "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); *see also Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996). A reasonable accommodation includes:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, . . . and other similar accommodation for individuals with disabilities.

42 U.S.C. § 12111(9) (emphasis added).[7] "[T]he burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir.1997). Once the employee proves that a reasonable accommodation exists, the employer may present evidence that its employee's requested accommodation imposes an unreasonable hardship. *See Willis*, 108 F.3d at 286; *Morisky*, 80 F.3d at 447.

■ On the one hand, Quick has admitted that she could fulfill all her job-related duties without the need of an accommodation. On the other hand, Quick argues that a reasonable accommodation included terminating a non-disabled employee to create a vacant position for her to fill. Quick admits that she was unaware of any positions which were not occupied at the time the decision was made to terminate her. Based on the circumstances reflected in the record, Quick's requested accommodation was not feasible, and her argument is contrary to law.

---

**6.** Although in *Bragdon*, that plaintiff's claim was brought under Title III of the ADA, relative to public accommodations and services operated by private entities, and involved the AIDS virus, as opposed to the instant case, brought under Title I of the ADA and involving the Hepatitis C virus, the Supreme Court's broad construction of the relevant terms transcends these case-specific details. The opinion appears to encompass all ADA claims, whether employment-based or not, and all diseases which create risks inherent in the reproduction process. *Cf. McGraw v. Sears, Roebuck & Co.*, 21 F.Supp.2d 1017, 1021 (D.Minn.1998) (while recognizing *Bragdon*'s

binding effect, the court distinguished its applicability between childbearing abilities incident to "normal consequences of aging," such as menopause, and a premature reproductive impairment due to communicable viral diseases).

**7.** *Bragdon* does not identify how an employer, or any other covered entity, can reasonably accommodate an ADA plaintiff whose asserted impairment substantially limits the reproductive system. Neither can the Court find any accommodation that could suffice to increase reproductive capabilities, especially in the employment context.

As a threshold matter, for purposes of Title I of the ADA, employers are obligated only to provide a reasonable accommodation which enables a disabled employee to perform the essential requirements of the employee's job. *See Willis,* 108 F.3d at 283. An employee is not entitled to her preferred accommodation, only one that is reasonable. *See Stewart,* 117 F.3d at 1285–86 (citations omitted).

Moreover, an employer is not required to create a position to accommodate a disabled employee, nor must an employer reassign the employee to a position occupied by a non-disabled employee. *See Terrell v. USAir,* 132 F.3d 621, 626–27 (11th Cir.1998) (citations omitted). The ADA seeks only to provide qualified disabled employees with opportunities equal to their non-disabled co-workers; it does not demand that employers give disabled employees priority in hiring and reassignment over non-disabled employees. *See Daugherty v. City of El Paso,* 56 F.3d 695, 700 (5th Cir.1995) (the ADA "prohibits employment discrimination against qualified individuals with disabilities, no more and no less.").

Quick's request that a non-disabled employee be terminated in order to retain her as an accommodation is not reasonable in light of the ADA's goals: "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for disabled individuals. 42 U.S.C. § 12101(a)(8). Complying with such an accommodation could subject employers to claims of reverse discrimination. *See Terrell,* 132 F.3d at 627. For this reason, employers are obligated only to provide "alternative employment opportunities reasonably available under the employer's existing policies." *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 1131 n. 19, 94 L.Ed.2d 307 (1987). Such a reasonable accommodation may include "reassignment to a *vacant* position." 42 U.S.C. § 12111(9)(B) (emphasis added). Quick's failure to prove that the accommodation was reasonable, is fatal to her burden of establishing a prima facie case under the ADA. *See Willis,* 108 F.3d at 283. On this basis, alone, Tripp Scott is entitled to summary judgment on Quick's ADA claim.[8]

### 2. *Defendant's Rebuttal of Plaintiff's Prima Facie Case*

Even if the Court were to assume that Quick established a prima facie case of discrimination as mandated under the ADA, presentation of a prima facie case does not alone establish a genuine issue of material fact sufficient to go to the jury. *See Young v. General Foods Corp.,* 840 F.2d 825, 829 (11th Cir.1988). It merely creates a rebuttable presumption of discrimination, thereby shifting the burden to Tripp Scott to articulate legitimate, non-discriminatory reasons for its decision to terminate Quick.[9] *See id.* Based on the proffered evidence, the Court finds that Tripp Scott has succeeded in discharging its burden.

---

8. An alternative basis for finding Quick failed to satisfy the third prong of a prima facie case is Quick's failure to request a reasonable accommodation. In the Eleventh Circuit, the scope of an employer's duty to reasonably accommodate a disabled employee is not triggered unless the employee specifically demands an accommodation. *See Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361, 1362 (11th Cir.1999). Quick never demanded an accommodation. More importantly, she never requested that Tripp Scott retain her as an accommodation for a disability until after she was discharged. However, Quick denies that she sought preferential treatment over her non-disabled co-workers.

Rather, she avers that, although she satisfied the requisite criteria, non-disabled employees were reassigned to vacant positions, while she was discriminatorily terminated on account of her disability. This issue is addressed in connection with Quick's allegations of "pretext."

9. The fourth prong of a prima facie case of ADA discrimination requires a plaintiff to demonstrate that the employer unlawfully discriminated because of the disability. Although the Court has not addressed this prong within its analysis of a prima facie case, discussion of this element within the context of pretext seems appropriate.

It is undisputed that Tripp Scott, based on economic and other business reasons, decided to eliminate its insurance defense department, to which Quick was assigned, as well as its medical malpractice department. Thus, the events giving rise to Quick's termination must be analyzed as a reduction in force case. To prevail, Quick must satisfy the following elements: (1) she is a member of a protected class, i.e., she has a disability; (2) she was qualified to assume another position at the time of her termination; and (3) Tripp Scott intended to discriminate in reaching its decision. *See Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 117 (5th Cir.1993).

It has already been determined that Quick has a disability recognized under the ADA. However, whether Quick was qualified to assume another position at the time of her termination is not so clear. Moreover, the third element of a reduction in force claim—whether Tripp Scott intentionally discriminated against Quick by terminating her because of her disability—is hotly contested. Accordingly, these last two elements need resolution to determine the propriety of summary judgment.

The gravamen of Quick's claim is that Tripp Scott targeted her for termination over the other junior paralegals at the firm because she contracted Hepatitis C. Quick concedes that Tripp Scott eliminated her department. There is no contention that Tripp Scott's decision to disband its unproductive departments was a pretext for illegal discrimination. However, Quick alleges that Tripp Scott arbitrarily skewed the qualifying criteria in a manner which adversely and discriminatorily singled her out for termination. Specifically, she argues that, having been employed longer than other similarly situated, non-disabled employees who were not laid off, her senior status entitled her to retention. Tripp Scott's avoidance of this factor in deciding which employees to discharge, according to

Quick, proves intentional discrimination. The Court disagrees.

It is undisputed that Tripp Scott was restructuring its workforce to increase its financial viability. Also, that Tripp Scott's restructuring efforts began in January 1996, well before Quick was diagnosed with Hepatitis C in April 1996, is not disputed. The record indicates that Tripp Scott conducted an across the board reduction in the two departments. Twenty-five employees were affected. Of these employees, thirteen were laid off, including five attorneys, five paralegals, one secretary, and two junior paralegals, one of whom was Quick. It is reasonable that completing a downsizing of this nature would span several months.

Nevertheless, Quick challenges the criteria used in determining reassignments and terminations of the junior paralegals. In particular, she claims that she had seniority over Cathy Sampsidis and Natalie Almeida, both of whom Tripp Scott hired after Quick. She also contends that she was qualified to perform the functions of the jobs to which Sampsidis and Almeida were assigned. Because Lopez, who was responsible for reviewing the personnel files of the affected employees and for applying the criteria, and because Lopez knew of Quick's condition, Quick argues that a genuine issue of material fact exists whether Quick's termination was motivated by discrimination due to her disability. Quick has not put forth any evidence to substantiate her claims.

Contrary to Quick's position, the unrefuted record evidence establishes that seniority was just one factor that was considered by Lopez in making termination evaluations. There is no evidence of record that seniority was the most important consideration. Other factors considered were the individual's skills, qualifications, educational background, and area of specialization.[10]

10. Quick challenges Tripp Scott's contention that it used these criterion in evaluating employee status. However, Quick offers no evidence to dispute Tripp Scott's representation.

As the party opposing summary judgment, it was Quick's obligation to do so. *See Allen,* 121 F.3d at 646.

In a reduction in force case, a crucial component in deciding if discrimination can be inferred is whether the non-disabled employees who were treated more favorably were similarly situated to the disabled, terminated employee. *See Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir.1995). Of the four junior paralegals in the purged departments, two were retained and two were terminated. According to Quick, she was the only disabled employee who was laid off. Although she claims that the other terminated junior paralegal, Manuel Cardoso, had disciplinary issues which led to Tripp Scott's decision to fire him, this claim has not been corroborated.

Of the two retained junior paralegals, Quick alleges that she had seniority over both Sampsidis and Almeida, and was equally qualified to perform the jobs to which they were reassigned. However, Quick has not adduced any evidence to support her contentions. Quick attempts to create a genuine issue of material fact regarding Tripp Scott's use of employee-ranking criteria by her deposition testimony and affidavit. Yet, "th[ese] sort[s] of conclusory allegation[s], unsupported by facts, will not suffice to overcome a well-supported Motion for Summary Judgment." *Hall v. Burger King Corp.*, 912 F.Supp. 1509, 1531 (S.D.Fla.1995) (citations omitted).

Furthermore, other than self-serving declarations of seniority and superior ability, Quick did not discount contrary evidence in the record. For instance, although Sampsidis did not join Tripp Scott until July 1995, she worked in an entirely different department and Quick did not present evidence that Sampsidis was performing the same type of assignments in the medical malpractice department as Quick performed in insurance defense. Additionally, at the time terminations were being contemplated, Sampsidis had sub-

stantially completed a certified paralegal course, one of the criteria considered for purposes of retention.

As for Almeida, although she was hired by Tripp Scott on December 6, 1993 and Quick had been an employee since October 31, 1991, Quick did not become a junior paralegal until at least December 1993, if not later. Quick has not produced evidence indicating whether senior status was dependent upon the total number of years employed, or upon the number of years an employee held a particular position.[11] However, even assuming Quick was slightly more senior to Almeida, she has not presented evidence that she was similarly situated to Almeida with regard to the other considered criteria. Moreover, Almeida was transferred to Tripp Scott's registered agent department, and thus, assumably had responsibilities different from that of litigation junior paralegals. Nevertheless, whether these assumptions are accurate or not, it was Quick's burden to show that Tripp Scott treated her less favorably, and that the sole reason for this disparate treatment was unlawful discrimination.

A reduction in force is a business decision and "the wisdom of [it] is not for a court or a jury to decide." *Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 977 (10th Cir.1996). Tripp Scott has stated that in eliminating its two departments and employees therein, Quick was terminated because other junior paralegals had preferable qualifications and work histories. Under the ADA, these are facially non-discriminatory reasons for retaining one employee over another. Accordingly, Tripp Scott has carried its burden of rebutting the presumption of discrimination. Consequently, in order to prevail, Quick must show that there is a genuine issue of fact whether Tripp Scott's proffered

---

**11.** Quick did not present any testimony or information, by way of depositions, interrogatory answers, or affidavits, regarding Tripp Scott's policies for recognizing seniority among its various levels of employees and departments. In fact, except for her own testimony and a chart prepared by Tripp Scott, she did not interject any evidence relative to this claim.

reason for the challenged action is pretextual and unworthy of belief.

### 3. Defendant's Articulated Reasons Are Not Pretextual

 Since Quick's alleged prima facie case of disability discrimination has been successfully rebutted, the burden returns to Quick. To meet her final burden and to overcome judgment as a matter of law, Quick must prove that Tripp Scott's proffered reason for terminating her was pretextual. *See St. Mary's Honor Ctr.,* 509 U.S. at 515–17, 113 S.Ct. at 2751–52; *Isenbergh,* 97 F.3d at 441. If Quick can persuade the Court that Tripp Scott's real reason for terminating her was disability-based discrimination, she will satisfy her burden of demonstrating, by a preponderance of the evidence, that she has been the victim of intentional discrimination. *See Carter,* 132 F.3d at 643.

Quick counters that Tripp Scott's proffered reasons are pretextual, but puts forth no evidence to support this contention. She would argue that, even though she performed her job without the need of a reasonable accommodation and did not visually appear to be impaired, her co-workers and supervisors regarded her as having a disability. This perception, according to Quick, was instrumental in including her in the personnel reduction.

The ADA covers adverse treatment as a result of an employer's perception that an employee is impaired. *See* 29 C.F.R. § 1630.2(1). A person is regarded as disabled where she:

(1) has a physical or mental impairment that does not substantially limit major life activities but is treated by her employer as constituting such limitation;

(2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) has no illness or malady defined by the EEOC as a physical or mental impairment but is treated by her employer as having a substantially limiting impairment.

*Id.* Including mere perception within the ADA's proscribed conduct is consistent with the statute's focus on the effect an employee's impairment has on the attitude of others. *See Gordon,* 100 F.3d at 913 (the provisions of the ADA are intended to combat the "archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities.").

The "regarded as" provision of the ADA is particularly applicable to persons with contagious diseases, such as Hepatitis C, due to the likelihood that fears, prejudices, and ignorance often manifest themselves in discriminatory conduct. It is these phobic reactions that the ADA was designed to address. *See Arline,* 480 U.S. at 284, 107 S.Ct. at 1129 ("Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment."). "Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness." *Id.*

Quick insists that Tripp Scott decided to discharge her solely because it knew or perceived her to be disabled. The intent of the ADA is to "enable disabled persons to compete in the workplace based on the same performance standards and requirements that employers expect of persons who are not disabled." *Malewski v. Nationsbank of Fla., N.A.,* 978 F.Supp. 1095, 1102 (S.D.Fla.1997) (citation omitted). It should not be interpreted as creating a double standard of treatment among employees. When considering an ADA claim within the context of a *bona fide* reduction in force, an employer is not required to "retain the least able [employee] because of a disability." *Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1196 (7th Cir.1997).

To survive summary judgment, Quick must show that there is a genuine issue of material fact whether Tripp Scott regarded her as having a disability. To make this determination, the focus is drawn to

"the interactions and perceptions of the persons interacting or working with [Quick]." *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir.1996). "[T]he mere fact that [Tripp Scott was] aware of [Quick's] impairment is insufficient to demonstrate either that [Tripp Scott] regarded [her] as disabled or that that perception caused the adverse employment action." *Id.*

Viewing the evidence in the light most favorable to Quick, the Court finds no substantiation that Tripp Scott, including Quick's immediate co-workers and supervisors, regarded her as disabled. The only evidence Quick presents is her own testimony, by way of deposition and affidavit. This testimony shows that, even under Quick's version of the facts, there exists no probative evidence that Tripp Scott acted upon the perception that she was disabled. Quick merely testified that she *felt* that it was too coincidental that she was terminated two months after disclosing her diagnosis. *See* Quick's deposition, at 67. However, the decision was made in the context of a legitimate reduction in force that had been considered several months prior to Quick's diagnosis. Thus, the timing of the termination decision, in and of itself, does not infer that Tripp Scott's proffered reason for laying off Quick was pretextual. *See, e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (three-month period between the plaintiff's protected activity and her termination, standing alone, does not demonstrate a causal connection).

As further support of unlawful intent, Quick stated that discrimination was evident because others with less seniority and less ability were retained, while she was terminated. *See* Quick's deposition, at 67. Although she believes that, absent the Hepatitis C virus she would still be employed by Tripp Scott, she admitted that she has no proof to support this contention. *See id.* at 73. To the best of her knowledge, all positions for which she was qualified to be reassigned were already occupied by other employees. *See id.* at 81. Therefore, none of these assertions are evidence of pretext.

Quick completely fails to establish that she was treated disparately because Tripp Scott perceived her as disabled. The fact that no vacant positions were available, as well as the fact that numerous other employees, including another junior paralegal, in addition to Quick, were affected by the reduction in force, precludes there being a material issue whether Quick was included in the affected group because Tripp Scott regarded her as having a disability. *See Ellison*, 85 F.3d at 193. Quick's speculative chain of reasoning and conclusory allegations are not supported by the record. There is not even a scintilla of evidence that any of Quick's co-workers displayed discriminatory animus toward her subsequent to her diagnosis.[12] The record contains no evidence to conclude that the persons with the final decisionmaking authority over terminations knew of Quick's condition at the time the decision was made to lay her off, nor considered Quick to be disabled or substantially limited with regard to a major life activity. While Quick may dispute the criteria used by Tripp Scott to effectuate its reduction in force, this alone is insufficient to raise a genuine issue as to pretext.

In sum, Quick has failed to proffer sufficient evidence that Tripp Scott's explanation for selecting her for lay off in the reduction in force was a mere pretext for discrimination. Her subjective opinion that Tripp Scott's actions were discriminatory, without supporting evidence, is not sufficient to establish Tripp Scott had the intent to discriminate against her. *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir.1997). Since it is Quick's burden to establish pretext, she "must present significantly probative evidence on the issue to avoid summary judgment." *See*

12. Quick's deposition testimony disputes this assertion. *See, e.g.,* Quick's deposition, at 53, 56, 66. Moreover, Quick stated that it did not even occur to her that she was laid off on account of a disability until after she was notified of termination, and after another firm failed to hire her, allegedly due to having Hepatitis C. *See id.* at 87.

*Young v. General Foods Corp.,* 840 F.2d 825, 829 (11th Cir.1988). Absent any evidence that Tripp Scott was motivated by a desire to terminate Quick because she had contracted the Hepatitis C virus, summary judgment in favor of Tripp Scott on Quick's ADA claim is warranted.

### B. Plaintiff's Claims Brought Pursuant to the Florida Civil Rights Act

In addition to her claim under the ADA, Quick brings claims of disability discrimination under the Florida Act. Like the ADA, the Florida Act prohibits employers covered by the statute from engaging in practices that discriminate against employees on the basis of, among other things, physical and mental disabilities. *See* § 760.10(1), Fla.Stat.

Because the Florida Act is patterned after federal civil rights statutes such as Title VII and the ADA, courts accord the Florida Act the same construction as the analogous federal laws. *See Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1387 (11th Cir.1998); *Fromm-Vane v. Lawnwood Med. Ctr., Inc.,* 995 F.Supp. 1471, 1475 n. 4 (S.D.Fla.1997); *Florida State Univ. v. Sondel,* 685 So.2d 923, 925 n. 1 (Fla. 1st DCA 1996). Therefore, federal case law dealing with the ADA is applicable to claims of disability-based discrimination allegedly violative of the Florida Act. *See id.*

No Florida Court has imposed liability under the Florida statute where liability has not been imposed under its federal counterpart. *Harper,* 139 F.3d at 1387. Accordingly, for the reasons set forth with respect to Quick's claim for disability discrimination in violation of the ADA, summary judgment on her parallel claim pursuant to the Florida Act is correspondingly appropriate.

### IV. Conclusion

Although factual disputes preclude summary judgment, the "mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the party seeking summary judgment." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). When a party's response consists of nothing "more than a repetition of [her] conclusional allegations," summary judgment is not only proper, but required. *Morris v. Ross,* 663 F.2d 1032, 1034 (11th Cir.1981).

Quick has not proffered sufficient evidence to rebut Tripp Scott's showing of the absence of any genuine issues of material fact. Moreover, by failing to satisfy the elemental proof necessary to indicate actionable conduct, Quick has failed to establish a prima facie case of disability-based discrimination. Because Quick failed to present a prima facie case of discrimination, the Court was not required to examine Tripp Scott's articulated reasons for its employment decisions nor determine whether those reasons were a pretext for discrimination. However, in reviewing the record as a whole, the Court still finds by merely opposing Tripp Scott's motion with unsubstantiated allegations of discrimination, as recited in her pleadings, Quick's approach is legally insufficient to controvert Tripp Scott's legitimate proof that no discrimination occurred and that no genuine issues of material fact exist.

While not insensitive to Quick's medical misfortune, the Court is required to decide this case based on the law. *See Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir.1995) (courts must construe the ADA to assure equal opportunities for disabled employees, and not for the purpose of obtaining leverage against employers or sympathy from a jury). "The ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face." *Hedberg v. Indiana Bell Tel. Co., Inc.,* 47 F.3d 928, 934 (7th Cir.1995).

The case law interpreting the ADA leads to the conclusion that, because the evidence established as a matter of law that Tripp Scott did not terminate Quick based on a disability, Tripp Scott is entitled to

summary judgment on Quick's claims,. Accordingly, Defendant's Motion for Summary Judgment is granted and this case is dismissed.